THE STATE OF OHIO, APPELLEE, v. JORDAN, APPELLANT.

THE STATE OF OHIO, APPELLANT AND CROSS-APPELLEE,
v. FINGER, APPELLEE AND CROSS-APPELLANT.

[Cite as State v. Jordan, 104 Ohio St.3d 21, 2004-Ohio-6085.]

(Nos. 2002–1888 and 2003–0567—Submitted March 30, 2004—Decided December 1, 2004.)

O'DONNELL, J.

{¶ 1} In these separate appeals, which we have consolidated for opinion purposes, we confront conflicting appellate resolutions of the situation that occurs when a trial court fails to notify an offender about postrelease control at the time of sentencing but incorporates that notice into its sentencing entry. We are called upon to settle the issue as presented in the following two cases:

*State v. Elven Finger:* case No. 2003–0567

{¶ 2} A Cuyahoga County petit jury returned verdicts finding Elven Finger guilty of three counts of felonious assault, all felonies of the second degree; for these offenses, R.C. 2967.28(B)(2) specifies a three-year period of mandatory postrelease control. Although the trial court did not notify Finger at the sentencing hearing that mandatory postrelease control would be part of his sentence, the court included it in the sentencing entry. Because the trial court did not notify Finger about postrelease control at the sentencing hearing, upon review, the appellate court ordered that postrelease control was not part of his

sentence. *State v. Finger*, Cuyahoga App. No. 80691, 2003-Ohio-402, 2003 WL 194773, at ¶ 101.

### *State v. Lenorris Jordan:* case No. 2002–1888

{¶ 3} Following his plea of no contest to one count of possession of cocaine, a felony of the fifth degree, the Cuyahoga County Court of Common Pleas convicted Lenorris Jordan of that offense. Upon the trial court determining that a prison term was necessary, R.C. 2929.19(B)(3)(d) required the court to advise Jordan that he could be subject to a period of postrelease control after his release from imprisonment if the parole board determined that to be necessary for him. The court did not notify Jordan at the sentencing hearing that he could be subject to postrelease control, but it included that notice in its sentencing entry. Upon appellate review, the court remanded the matter for resentencing. *State v. Jordan*, Cuyahoga App. No. 80675, 2002-Ohio-4587, 2002 WL 2027525, at ¶ 14–16.

{¶ 4} These cases are similar in that the trial courts in both instances failed to notify the offenders about postrelease control at the sentencing hearings but properly incorporated postrelease control into the respective sentencing entries. A chief distinction between them, however, arises in that *State v. Finger* involves a period of mandatory postrelease control, while *State v. Jordan* involves a period of up to three years of postrelease control imposed at the discretion of the Adult Parole Authority, provided however, that the trial court has complied with our decision in *Woods v. Telb* (2000), 89 Ohio St.3d 504, 733 N.E.2d 1103.

{¶ 5} One of the principal issues for our resolution, therefore, concerns whether a sentencing court satisfies R.C. 2929.19(B)(3) when it incorporates postrelease control into a sentencing entry but fails to notify the offender about it at the sentencing hearing.

{¶ 6} As a general rule, a court speaks only through its journal. *Kaine v. Marion Prison Warden* (2000), 88 Ohio St.3d 454, 455, 727 N.E.2d 907; *Schenley v. Kauth* (1953), 160 Ohio St. 109, 51 O.O. 30, 113 N.E.2d 625, paragraph one of the syllabus ("A court of record speaks only through its journal and not by oral pronouncement or mere written minute or memorandum"). "Were the rule otherwise it would provide a wide field for controversy as to what the court actually decided." *Indus. Comm. v. Musselli* (1921), 102 Ohio St. 10, 15, 130 N.E. 32.

{¶ 7} Crim.R. 32(C) is reflective of this long-standing rule in Ohio. *Kaine*, 88 Ohio St.3d at 455, 727 N.E.2d 907. It states:

{¶ 8} "A judgment of conviction shall set forth the plea, the verdict or findings, and the sentence. If the defendant is found not guilty or for any other reason is entitled to be discharged, the court shall render judgment accordingly. The judge shall sign the judgment and the clerk shall enter it on the journal. *A*

*judgment is effective only when entered on the journal by the clerk."* (Emphasis added.)

{¶ 9} In enacting Am.Sub.S.B. No. 2, 146 Ohio Laws, Part IV, 7136, effective July 1, 1996, the General Assembly has placed additional duties on the trial courts of this state in furtherance of its goal of achieving "truth in sentencing." See *State v. Martello,* 97 Ohio St.3d 398, 2002-Ohio-6661, 780 N.E.2d 250, ¶ 10; see, also, R.C. 181.24. The law now makes sentencing a more complex task and requires a court to make findings when it exercises its discretion to impose the maximum sentence, consecutive sentences, or more than the minimum sentence. See, inter alia, *State v. Comer,* 99 Ohio St.3d 463, 2003-Ohio-4165, 793 N.E.2d 473; see, also, *State v. Brooks,* 103 Ohio St.3d 134, 2004-Ohio-4746, 814 N.E.2d 837. Now, in order to properly impose sentence in a felony case, a trial court must consider and analyze numerous sections of the Revised Code to determine applicability and must provide notice to offenders at the sentencing hearing and incorporate that notice into its journal entry. See, e.g., R.C. 2925.02, 2929.11, 2929.12, 2929.13, 2929.14, 2929.15, and 2929.18. Nonetheless, in every sentencing, courts must follow the dictates of the General Assembly.

{¶ 10} Due to the present complexity of sentencing, S.B. 2 envisions participation by both the prosecutor and defense counsel at the sentencing hearing. See R.C. 2929.11 et seq. It also affords the parties meaningful review of sentencing decisions. R.C. 2953.08(G)(2); see, also, *Comer,* at ¶ 10; *State v. Brooks,* 103 Ohio St.3d 134, 2004-Ohio-4746, 814 N.E.2d 837.

{¶ 11} Today, we consider cases governed by R.C. 2929.19(B)(3), which states:

{¶ 12} "Subject to division (B)(4) of this section, if the sentencing court determines at the sentencing hearing that a prison term is necessary or required, the court shall do all of the following:

{¶ 13} " * * *

{¶ 14} "(c) Notify the offender that the offender will be supervised under section 2967.28 of the Revised Code after the offender leaves prison if the offender is being sentenced for a felony of the first degree or second degree, for a felony sex offense, or for a felony of the third degree in the commission of which the offender caused or threatened to cause physical harm to a person;

{¶ 15} "(d) Notify the offender that the offender may be supervised under section 2967.28 of the Revised Code after the offender leaves prison if the offender is being sentenced for a felony of the third, fourth or fifth degree that is not subject to division (B)(3)(c) of this section."[1]

---

1. In addition, R.C. 2929.19(B)(3)(e) requires the trial court to notify the offender that failing to comply with the conditions of postrelease control could result in the imposition of a prison term "of

{¶ 16} In *State v. Comer*, 99 Ohio St.3d 463, 2003-Ohio-4165, 793 N.E.2d 473, we recently considered whether R.C. 2929.19(B)(2) requires a trial court, when imposing consecutive sentences, to make certain findings and to state its reasons for those findings at the sentencing hearing, or whether it could fulfill those requirements by incorporating them in its written sentencing entry. There, we held that "R.C. 2929.19 clearly prescribes what a trial judge must do and say at a felony sentencing hearing." Id. at ¶ 20. We also determined that requiring these statutory obligations to be satisfied at the sentencing hearing "comports with case law and with the purposes and intent of S.B. 2." Id. at ¶ 21. See, also, *State v. Brooks*, 103 Ohio St.3d 134, 2004-Ohio-4746, 814 N.E.2d 837, where we held that "[p]ursuant to R.C. 2929.19(B)(5), a trial court sentencing an offender to a community control sanction is required to deliver the statutorily detailed notifications *at the sentencing hearing*." (Emphasis added.) Id. at paragraph one of the syllabus.

{¶ 17} The reasoning in *Comer* and *Brooks* equally applies to R.C. 2929.19(B)(3)—a subdivision that expressly prescribes what a trial court must do "at the sentencing hearing" after it has decided to impose a prison term. Therefore, when sentencing a felony offender to a term of imprisonment, a trial court is required to notify the offender at the sentencing hearing about postrelease control[2] and is further required to incorporate that notice into its journal entry imposing sentence. Here, the trial courts erred by failing to notify Finger and Jordan about postrelease control at the sentencing hearings, despite incorporating that notice into their respective sentencing entries.

{¶ 18} The question then becomes whether, under these circumstances, the matter should be remanded for resentencing, as contended by the state, or whether postrelease control should be eliminated from the sentence, as argued by Finger and Jordan.

{¶ 19} In *Woods v. Telb*, 89 Ohio St.3d 504, 733 N.E.2d 1103, we detailed the constitutional significance of a trial court including postrelease control in its sentence. We stated that because the separation-of-powers doctrine precludes the executive branch of government from impeding the judiciary's ability to impose a sentence, the problem of having the Adult Parole Authority impose postrelease control at its discretion is remedied by a trial court incorporating postrelease control into its original sentence. Id. at 512–513, 733 N.E.2d 1103. Consequently, unless a trial court includes postrelease control in its sentence, the

---

up to one-half of the stated prison term originally imposed upon the offender." This subdivision, however, is not at issue in the present cases.

2. We note that personally advising the offender about postrelease control at the sentencing hearing pursuant to R.C. 2929.19(B)(3) alleviates any potential problems pursuant to Crim.R. 43(A), which requires a defendant to be present at sentencing.

Adult Parole Authority is without authority to impose it. See id. Today, we reaffirm that holding.

{¶ 20} But our analysis here is deeper. R.C. 2929.14(F)[3] and 2967.28[4] require that every sentence of imprisonment for a felony contain a term of postrelease control, regardless of whether the offense is subject to a mandatory period for an enumerated term of years pursuant to R.C. 2967.28(B) or a discretionary period to be imposed as determined necessary by the parole board pursuant to R.C. 2967.28(C).

{¶ 21} The plain language of R.C. 2929.14(F) and 2967.28 evinces the intent of the General Assembly not only to make all incarcerated felons subject to mandatory or discretionary postrelease control but also to require all sentencing trial courts in this state to include postrelease control as part of the sentence for every incarcerated offender. As we have observed in the past, postrelease control furthers the goal of successfully reintegrating offenders into society after their release from prison. *State v. Martello*, 97 Ohio St.3d 398, 2002-Ohio-6661, 780 N.E.2d 250, at ¶ 16, quoting *Woods v. Telb*, 89 Ohio St.3d at 512, 733 N.E.2d 1103 (" 'post-release control sanctions are aimed at behavior modification in the attempt to reintegrate the offender safely into the community' ").

---

3. {¶ a} R.C. 2929.14(F) provides:

{¶ b} "If a court imposes a prison term of a type described in division (B) of section 2967.28 of the Revised Code, it shall include in the sentence a requirement that the offender be subject to a period of post-release control after the offender's release from imprisonment, in accordance with that division. If a court imposes a prison term of a type described in division (C) of that section, it shall include in the sentence a requirement that the offender be subject to a period of post-release control after the offender's release from imprisonment, in accordance with that division, if the parole board determines that a period of post-release control is necessary."

4. {¶ a} R.C. 2967.28 states:

{¶ b} "(B) Each sentence to a prison term for a felony of the first degree, for a felony of the second degree, for a felony sex offense, or for a felony of the third degree that is not a felony sex offense and in the commission of which the offender caused or threatened to cause physical harm to a person shall include a requirement that the offender be subject to a period of post-release control imposed by the parole board after the offender's release from imprisonment. Unless reduced by the parole board pursuant to division (D) of this section when authorized under that division, a period of post-release control required by this division for an offender shall be of one of the following periods:

{¶ c} "(1) For a felony of the first degree or for a felony sex offense, five years;

{¶ d} "(2) For a felony of the second degree that is not a felony sex offense, three years;

{¶ e} "(3) For a felony of the third degree that is not a felony sex offense and in the commission of which the offender caused or threatened physical harm to a person, three years.

{¶ f} "(C) Any sentence to a prison term for a felony of the third, fourth, or fifth degree that is not subject to division (B)(1) or (3) of this section shall include a requirement that the offender be subject to a period of post-release control of up to three years after the offender's release from imprisonment, if the parole board, in accordance with division (D) of this section, determines that a period of post-release control is necessary for that offender."

{¶ 22} We, however, recognize that the use by courts⌐ of such terms as "mandatory postrelease control" and "discretionary postrelease control" can be misleading with regard to a trial court's duty to include postrelease control in a felony offender's prison sentence. While it is true that the Adult Parole Authority may exercise discretion in imposing postrelease control in certain cases, a sentencing trial court has no such discretion. Accordingly, if a trial court has decided to impose a prison term upon a felony offender, it is duty-bound to notify that offender at the sentencing hearing about postrelease control and to incorporate postrelease control into its sentencing entry, which thereby empowers the executive branch of government to exercise its discretion. See *Woods v. Telb,* 89 Ohio St.3d at 512–513, 733 N.E.2d 1103. Stated differently, even in cases under R.C. 2967.28(C) where the General Assembly has granted the Adult Parole Authority discretion to impose postrelease control, a sentencing trial court must notify the offender about postrelease control and include it in its judgment entry. Therefore, the distinction between discretionary and mandatory postrelease control is one without a difference with regard to the duty of the trial court to notify the offender at the sentencing hearing and to incorporate postrelease control notification into its journal entry. See R.C. 2967.28(B) and (C).

{¶ 23} Because a trial court has a statutory duty to provide notice of postrelease control at the sentencing hearing, any sentence imposed without such notification is contrary to law. As a general rule, if an appellate court determines that a sentence is clearly and convincingly contrary to law, it may remand for resentencing. See R.C. 2953.08(G)(2).[5] Furthermore, where a sentence is void because it does not contain a statutorily mandated term, the proper remedy is, likewise, to resentence the defendant. See *State v. Beasley* (1984), 14 Ohio St.3d 74, 14 OBR 511, 471 N.E.2d 774.

{¶ 24} In *Beasley,* despite a statutory requirement for imposing a minimum two-year term of incarceration for felonious assault, the trial court sentenced Beasley to only a $500 fine. After the trial court corrected its sentence to comply with the statute, Beasley appealed, arguing double jeopardy. In holding that the trial court's correction of its statutorily improper sentence did not violate the constitutional guarantee to be free from double jeopardy, we stated:

{¶ 25} "Any attempt by a court to disregard statutory requirements when imposing a sentence renders the attempted sentence a nullity or void. The applicable sentencing statute in this case, R.C. 2929.11, mandates a two to fifteen year prison term and an optional fine for felonious assault. The trial court disregarded the statute and imposed only a fine. In doing so the trial court

---

5. R.C. 2953.08(G)(2) provides that if an appellate court clearly and convincingly finds that a sentence is contrary to law, it may "increase, reduce, or otherwise modify a sentence * * * or may vacate the sentence and remand the matter to the sentencing court for resentencing."

exceeded its authority and this sentence must be considered void. Jeopardy did not attach to the void sentence, and, therefore, the court's imposition of the correct sentence did not constitute double jeopardy." Id. at 75, 14 OBR 511, 471 N.E.2d 774.

{¶ 26} The court's duty to include a notice to the offender about postrelease control at the sentencing hearing is the same as any other statutorily mandated term of a sentence. And based on the reasoning in *Beasley*, a trial court's failure to notify an offender at the sentencing hearing about postrelease control is error.

{¶ 27} Accordingly, when a trial court fails to notify an offender about postrelease control at the sentencing hearing but incorporates that notice into its journal entry imposing sentence, it fails to comply with the mandatory provisions of R.C. 2929.19(B)(3)(c) and (d), and, therefore, the sentence must be vacated and the matter remanded to the trial court for resentencing.

{¶ 28} In addition to the foregoing, Jordan argues that because the trial court failed to advise him about postrelease control at the time of his plea, it failed to comply with Crim.R. 11(C), and, therefore, to remedy that problem, we should eliminate postrelease control from his sentence. Notably, Jordan does not seek to withdraw his plea on this basis. Rather, he argues that removing postrelease control from his sentence would remedy any such defect and that allowing appellate courts to vacate postrelease control under these circumstances would prevent a deluge of challenges from similarly situated offenders. However, while the court's lack of notification about postrelease control at the plea hearing could in some instances form a basis to vacate a plea, it cannot and does not form the basis to modify a sentence—or a portion thereof—imposed by a trial judge not in conformity with the law. As we have decided, when a trial court fails to properly discharge its statutory duty with respect to postrelease control notification, the sentence must be vacated and the matter remanded for resentencing.

{¶ 29} Because the appellate court in *Finger* ordered the trial court to "correct [Finger's] sentencing journal entry to reflect that post-release control is not part of his sentence," instead of remanding the case for resentencing, that judgment is reversed. *State v. Finger*, 2003-Ohio-402, 2003 WL 194773, at ¶ 101. In contrast, the judgment of the appellate court in *Jordan* is affirmed, as it properly remanded for resentencing due to the trial court's failure to notify Jordan at the sentencing hearing about postrelease control. *State v. Jordan*, 2002-Ohio-4587, 2002 WL 2027525, at ¶ 14–16.

### Jordan Suppression Issues

{¶ 30} In *Jordan*, we are additionally called upon to determine whether the officers' investigative stop and protective search of Jordan violated the Fourth Amendment to the United States Constitution and Section 14, Article I of the

Ohio Constitution, thereby requiring the suppression of the fruits of the search pursuant to the exclusionary rule.

{¶ 31} The suppression-hearing record reveals the following facts: On July 23, 2001, Officer Richard Martinez of the Cleveland Police Department and his partner responded to an anonymous tip that a black male was "doing drugs" on the porch of 2019 West 105th Street in Cleveland, Ohio, and that the same male had earlier been driving a light blue car, which was now parked in front of that address. Officer Martinez described the location as a "high-drug activity area" to which he had gone concerning drug activity "a couple of hundred times" over five and one-half years. Upon arriving in a marked police vehicle, he observed Jordan and another man sitting on the front porch and a blue vehicle fitting the tipster's description parked nearby. As the uniformed officers approached them, Jordan "hollered something" to his companion, who immediately fled through the house and out the back door. Jordan, however, remained on the porch. Officer Martinez explained to Jordan that they had received a report of a "black male selling drugs from that porch, and driving that vehicle." Upon being asked, Jordan confirmed that the vehicle belonged to him.

{¶ 32} Based upon these circumstances and his experience that people engaged in drug activity in that area often carried weapons, Officer Martinez conducted a protective pat-down search, during which he felt a crack pipe in Jordan's shirt pocket. Officer Martinez seized the pipe and arrested Jordan, who was subsequently indicted for possession of cocaine, in violation of R.C. 2925.11(C)(4). After the trial court denied Jordan's motion to suppress, he pled no contest to the charge.

{¶ 33} The appellate court affirmed, holding that, based on the anonymous tip being partially confirmed by the presence of the blue car, the flight of the other man when Jordan spoke to him upon the officers' arrival, and the area being known for high-drug activity, the officer had a reasonable suspicion of criminal activity sufficient to support an investigatory stop. *State v. Jordan,* Cuyahoga App. No. 80675, 2002-Ohio-4587, 2002 WL 2027525, at ¶ 9. The court further determined that these circumstances, together with Officer Martinez's testimony that, in his experience, it was common for individuals involved in drug activity to have weapons, created a reasonable suspicion that Jordan was armed, justifying a protective pat-down for weapons. Id. at ¶ 10.

## The Validity of the Investigative Stop

{¶ 34} Jordan argues that the police officers who searched him did not have a reasonable suspicion to believe that he was engaged in criminal activity sufficient to justify an investigative stop. He contends that because the anonymous tip failed to demonstrate that the tipster had knowledge of concealed criminal activity, it was unreliable and did not create a reasonable suspicion that he was

engaged in criminal activity, and that his companion's flight from the police—while he remained on the porch—did not support such a suspicion.

{¶ 35} An investigative stop does not violate the Fourth Amendment to the United States Constitution if the police have reasonable suspicion that "the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez* (1981), 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621. Reasonable suspicion can arise from information that is less reliable than that required to show probable cause. *Alabama v. White* (1990), 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301. But it requires something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry v. Ohio* (1968), 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889. "[T]he Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow* (2000), 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570.

{¶ 36} An anonymous informant's tip can give rise to a reasonable suspicion of criminal activity. See, e.g., *White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301. Courts have generally recognized three categories of informants: (1) the identified citizen informant, (2) the known informant, i.e., someone from the criminal world who has a history of providing reliable tips, and (3) the anonymous informant. *Maumee v. Weisner* (1999), 87 Ohio St.3d 295, 300, 720 N.E.2d 507. A tip from an anonymous informant, standing alone, is generally insufficient to support reasonable suspicion of criminal activity, because it lacks the necessary indicia of reliability. *White,* 496 U.S. at 329, 110 S.Ct. 2412, 110 L.Ed.2d 301. "Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.'" (Citation omitted.) *Florida v. J.L.* (2000), 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254, quoting *White,* 496 U.S. at 329, 110 S.Ct. 2412, 110 L.Ed.2d 301. Accordingly, anonymous tips normally require suitable corroboration demonstrating "'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" *Florida v. J.L.,* 529 U.S. at 270, 120 S.Ct. 1375, 146 L.Ed.2d 254, quoting *White,* 496 U.S. at 329, 110 S.Ct. 2412, 110 L.Ed.2d 301; see, also, *Weisner,* 87 Ohio St.3d at 300, 720 N.E.2d 507.

{¶ 37} In *J.L.,* the United States Supreme Court clarified the nature of the corroboration required to render an anonymous tip reliable. In that case, the police received information from an anonymous informant that a young black male, who was wearing a plaid shirt and standing at a particular bus stop, was carrying a gun. When the police arrived at that bus stop, they observed three black males, one of whom was wearing a plaid shirt. They frisked him and seized a gun from his pocket.

{¶ 38} Based on these facts, the Supreme Court unanimously declared the investigative stop invalid, holding that an anonymous tip that a person is carrying a gun, without more, is insufficient to justify a police officer's stop and frisk of that person. Id., 529 U.S. at 268, 120 S.Ct. 1375, 146 L.Ed.2d 254. The court explained:

{¶ 39} "The anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting J.L. of engaging in unlawful conduct: The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L. * * *

{¶ 40} " * * *

{¶ 41} "An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person. Cf. 4 W. LaFave, Search and Seizure § 9.4(h), p. 213 (3d ed.1996) (distinguishing reliability as to identification, which is often important in other criminal law contexts, from reliability as to the likelihood of criminal activity, which is central in anonymous-tip cases)." J.L., 529 U.S. at 271–272, 120 S.Ct. 1375, 146 L.Ed.2d 254.

{¶ 42} In the present case, Jordan correctly asserts that, as in J.L., the anonymous tip failed to show that the informant had "knowledge of concealed criminal activity" and was thus reliable in its assertion of illegality. At most, the tip helped the officers identify a "determinate person." Here, the officers were able to corroborate information related by the tipster in that they located a blue vehicle matching the description provided and a male on the porch who also matched the description, albeit the tip did not contain enough information for them to determine which of the males had been driving the vehicle or selling the drugs. But the tip provided no basis upon which to test its assertion of illegal conduct, and the officers did not personally observe either Jordan or his companion engage in criminal activity. Accordingly, the officers' partial corroboration of the informant's tip alone did not give the officers a reasonable suspicion of criminal activity sufficient to justify the stop.

{¶ 43} Significantly, however, the officers did not base their decision solely on the anonymous tip; rather, they placed considerable weight on the flight of Jordan's companion immediately following Jordan's shout to him upon their arrival. Neither this court, nor the United States Supreme Court, has previously determined the validity of an investigative stop under similar circumstances. The United States Supreme Court, however, has addressed whether a person's unprovoked flight from police gives rise to a reasonable, particularized suspicion that the person is engaged in criminal activity, so that an investigatory stop does not violate the Fourth Amendment to the United States Constitution. See *Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570.

{¶ 44} In *Wardlow*, two uniformed officers, Nolan and Harvey, were driving the last vehicle of a four-car caravan in an area known for heavy narcotics trafficking for the purpose of investigating drug transactions, when they observed Wardlow standing next to a building holding an opaque bag. Wardlow looked in the officers' direction and then fled. Officer Nolan eventually stopped and patted him down for weapons. During that search, Nolan squeezed the opaque bag and discovered a handgun with live ammunition. The officers then arrested Wardlow.

{¶ 45} In determining that the investigatory stop did not violate the Fourth Amendment, the United States Supreme Court wrote:

{¶ 46} "Nolan and Harvey were among eight officers in a four-car caravan that was converging on an area known for heavy narcotics trafficking, and the officers anticipated encountering a large number of people in the area, including drug customers and individuals serving as lookouts. * * * It was in this context that Officer Nolan decided to investigate Wardlow after observing him flee. An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis. *Adams v. Williams*, 407 U.S. 143, 144, 147–148, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

{¶ 47} "In this case, moreover, it was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police. Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. *United States v. Brignoni–Ponce*, 422 U.S. 873, 885, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Florida v. Rodriguez*, 469 U.S. 1, 6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984) *(per curiam); United States v. Sokolow* [ (1989), 490 U.S. 1,

8–9, 109 S.Ct. 1581, 104 L.Ed.2d 1]. Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior. See *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). We conclude Officer Nolan was justified in suspecting that Wardlow was involved in criminal activity, and, therefore, in investigating further." *Wardlow,* 528 U.S. at 124–125, 120 S.Ct. 673, 145 L.Ed.2d 570.

{¶ 48} Here, Jordan argues that *Wardlow* sets forth the constitutional minimum for defining reasonable suspicion and that, unlike Wardlow, he did not flee upon noticing the police or otherwise personally exhibit evasive behavior. He asserts that his companion's unprovoked flight should not be imputed to him and directs this court's attention to *State v. Jason L.* (2000), 129 N.M. 119, 2 P.3d 856, where the New Mexico Supreme Court refused to impute a companion's evasive conduct to another individual in the context of determining whether a reasonable suspicion of criminal activity existed.

{¶ 49} In *Jason L.,* police officers stopped two minors, the defendant Jason and his friend Filemon, because the officers had observed Filemon exhibiting suspicious behavior. During a pat-down search of Filemon, they discovered two firearms, so they proceeded to frisk Jason and seized a firearm from him as well. The state sought to justify the investigative stop of Jason based upon his friend's conduct. The New Mexico Supreme Court, however, held that the officers needed an individualized, particularized suspicion that Jason had committed or was about to commit a crime and that the trial court correctly refused to rely on the friend's conduct to justify the detention of Jason. Id. at 126, 2 P.3d 856.

{¶ 50} *Jason L.* is clearly distinguishable from the present case, as Jordan personally exhibited behavior suggestive of criminal activity. Jordan did not merely sit on the porch while his companion fled upon noticing the arrival of the police. Rather, the officers heard him shout something, albeit unintelligible, upon their approach, prompting his companion's immediate flight. Officer Martinez believed this conduct to be suspicious and suggestive of criminal activity because, in his experience, drug dealers often have lookouts when they are engaged in dealing drugs. Thus, the facts herein are far removed from the situation where someone else's evasive conduct is imputed to another solely due to proximity.

{¶ 51} Furthermore, we find no merit in Jordan's contention that the record does not support an inference that he served as a lookout because it does not

contain evidence that he knew of the officers' approach, that there was adequate lighting and an unobstructed view allowing him to see the officers, that the police vehicle was clearly marked, that the officers were visible from the porch when his companion fled, and that his unintelligible shout was intended as a warning to his friend. The record, however, reflects that shortly after exiting a marked police vehicle while approaching the porch, Officer Martinez, who was wearing his uniform, heard Jordan hollering something and then saw Jordan's companion immediately flee. Contrary to Jordan's assertion, a reasonable inference from this evidence is that Jordan not only had the ability to but also did, in fact, see the officer and warned his friend, as evidenced by his friend's immediate flight. The fact that Jordan's conduct might be susceptible of an innocent explanation does not necessarily establish a violation of the Fourth Amendment. See *Wardlow*, 528 U.S. at 125, 120 S.Ct. 673, 145 L.Ed.2d 570.

{¶ 52} To summarize, the officers did not base their decision to conduct an investigative stop of Jordan solely on either the partially corroborated anonymous tip or on the companion's flight. Rather, they considered the totality of the circumstances: their receipt of an anonymous tip regarding drug activity that they were able to partially confirm, the residence location in an area known to them as a high drug activity area, Jordan's shout upon seeing their approach in uniform, and his companion's immediate flight. It is well settled that "[t]he propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances." *State v. Bobo* (1988), 37 Ohio St.3d 177, 524 N.E.2d 489, at paragraph one of the syllabus; see, also, *United States v. Cortez* (1981), 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621. The circumstances described above, taken as a whole, created a reasonable suspicion that Jordan was engaged in illegal activity, and, therefore, the officers' investigatory stop did not violate the Fourth Amendment.

{¶ 53} Jordan urges that if the investigatory stop does not offend the Fourth Amendment as defined in *Wardlow*, this court should recognize that the Ohio Constitution provides even greater protection such that unprovoked flight in a high-crime area upon seeing police officers is insufficient to justify a stop. Jordan argues that a persuasive reason for recognizing greater protection under the Ohio Constitution is that a person's decision to flee can be motivated by many innocent factors, as recognized by Justice Stevens in his separate opinion in *Wardlow* joined by three other Justices. *Wardlow*, 528 U.S. at 132–134, 139, 120 S.Ct. 673, 145 L.Ed.2d 570 (Stevens, J., concurring in part and dissenting in part).

{¶ 54} Recognizing that Jordan did not raise this argument before the trial court and that, although he raised it in the court of appeals, that court did not explicitly address it in its opinion, we nonetheless have considered the issue.

{¶ 55} The Fourth Amendment to the United States Constitution,[6] made applicable to the states through the Fourteenth Amendment, and Section 14, Article I of the Ohio Constitution[7] contain nearly identical language. And this court has determined that the protections afforded by the Fourth Amendment are generally coextensive with those provided by the Ohio Constitution. *State v. Robinette* (1997), 80 Ohio St.3d 234, 238–239, 685 N.E.2d 762. We have, however, recently recognized an exception to the general rule in *State v. Brown,* 99 Ohio St.3d 323, 2003-Ohio-3931, 792 N.E.2d 175. There, after acknowledging that " 'we should harmonize our interpretation of Section 14, Article I of the Ohio Constitution with the Fourth Amendment, unless there are persuasive reasons to find otherwise,' " id. at ¶ 22, quoting *Robinette* at 239, 685 N.E.2d 762, we concluded that ample reasons existed for holding that the Ohio Constitution provides greater protection than the Fourth Amendment regarding warrantless arrests for minor misdemeanors. *Brown* at syllabus. None of the considerations compelling our determination in *Brown* are present here, and we discern no persuasive reasons for holding that the Ohio Constitution affords greater protection than the Fourth Amendment under the circumstances of this case. Accordingly, the investigatory stop did not violate Section 14, Article I of the Ohio Constitution.

### The Validity of the Protective Search

{¶ 56} Jordan asserts that even if the circumstances justified an investigative stop, the officers lacked a reasonable suspicion that he was armed, which is required before a protective pat-down can occur. Therefore, according to Jordan, the fruits of the search—to wit, the crack pipe—should have been suppressed.

{¶ 57} In the landmark case of *Terry v. Ohio* (1968), 392 U.S. 1, 29, 88 S.Ct. 1868, 20 L.Ed.2d 889, the United States Supreme Court recognized that a police officer may conduct a limited search for weapons in order to protect himself and others within the immediate vicinity. The court held:

{¶ 58} "[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently

---

6. {¶ a} The Fourth Amendment to the United States Constitution states:

{¶ b} "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

7. {¶ a} Section 14, Article I of the Ohio Constitution provides:

{¶ b} "The right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the person and things to be seized."

dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." Id., 392 U.S. at 30, 88 S.Ct. 1868, 20 L.Ed.2d 889.

{¶ 59} This court, relying on *Terry,* has similarly held that "[w]here a police officer, during an investigative stop, has a reasonable suspicion that an individual is armed based on the totality of the circumstances, the officer may initiate a protective search for the safety of himself and others." *Bobo,* 37 Ohio St.3d 177, 524 N.E.2d 489, at paragraph two of the syllabus.

{¶ 60} In the present case, viewing the totality of the circumstances, Officer Martinez had a reasonable objective basis for suspecting that Jordan was armed. He had received an anonymous tip that a male had been doing drugs on the porch of a certain address in an area known for high drug activity and had been driving a particular blue vehicle. When Officer Martinez arrived, he noticed a blue vehicle matching the tipster's description and two men on the porch, thereby corroborating certain details of the tip. In addition, Jordan's shout appeared to prompt his companion's immediate flight, leading Officer Martinez to conclude that Jordan served as a lookout and was involved in drug activity, because from the officer's experience, drug dealers commonly employ lookouts during drug transactions. The officer further related that he feared for his safety because based on his experience—including personally responding to hundreds of drug-related calls in that area—individuals there involved in drug activity commonly carry weapons. Jordan's confirmation that the blue vehicle belonged to him did nothing to dispel the officer's fear for his safety.

{¶ 61} This court has written that "[t]he right to frisk is virtually automatic when individuals are suspected of committing a crime, like drug trafficking, for which they are likely to be armed. 'The nature of narcotics trafficking today reasonably warrants the conclusion that a suspected dealer may be armed and dangerous.'" (Citation omitted.) *State v. Evans* (1993), 67 Ohio St.3d 405, 413, 618 N.E.2d 162, quoting *United States v. Ceballos* (E.D.N.Y.1989), 719 F.Supp. 119, 126. Considering the totality of the circumstances, we conclude that Officer Martinez was justified in conducting a limited pat-down search for weapons.[8]

---

8. Jordan has not challenged in this court the scope of the pat-down search and seizure of the crack pipe in accordance with the "plain feel" doctrine. See *Minnesota v. Dickerson* (1993), 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334.

{¶ 62} Based on the foregoing, we hold that neither the investigatory stop nor the protective search of Jordan violated the Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution. Accordingly, the appellate court properly upheld the trial court's decision to deny the motion to suppress, and we affirm that judgment.

## Conclusion

{¶ 63} The court of appeals' judgment in *Jordan* is affirmed. The court of appeals' judgment in *Finger* regarding postrelease control is reversed, and the cause is remanded to the trial court for resentencing consistent with our decision. Finger's cross-appeal is dismissed as having been improvidently accepted.

Judgment affirmed
in case No. 2002–1888.


Judgment reversed
and cause remanded
in case No. 2003–0567.


MOYER, C.J., F.E. SWEENEY, LUNDBERG STRATTON and O'CONNOR, JJ., concur.

RESNICK, J., concurs in judgment only.

PFEIFER, J., concurs in part and dissents in part.

———————

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 64} I concur in the judgment and syllabus of the majority with respect to the postrelease control issues.

{¶ 65} I also agree with the majority's conclusion that "the officers' partial corroboration of the informant's tip *alone* did not give the officers a reasonable suspicion of criminal activity sufficient to justify the stop." (Emphasis sic.) I disagree with the majority's conclusion that the officers had an individual particularized suspicion that Jordan had committed or was about to commit a crime based on "their receipt of an anonymous tip regarding drug activity that they were able to partially confirm, the residence location in an area known to them as a high drug activity area, and Jordan's shout upon seeing their approach in uniform, and his companion's immediate flight."

{¶ 66} First, the anonymous tip was not partially confirmed as to drug activity and therefore was not shown to "be reliable in its assertion of illegality." *Florida v. J.L.* (2000), 529 U.S. 266, 272, 120 S.Ct. 1375, 146 L.Ed.2d 254. Second, the location of the residence does not suggest anything as to Jordan; most people who live in high-drug-activity areas are law-abiding citizens. Third, Jordan's

shout was unintelligible and is suggestive of nothing untoward absent his companion's flight. Fourth, Jordan's companion's flight suggests that he had something to hide, not that Jordan did.

{¶ 67} The majority states that the facts of this case "are far removed from the situation where someone else's evasive conduct is imputed to another solely due to proximity." I disagree. The determinative factor according to the majority opinion is the fact that Jordan's companion fled the scene. Absent that, Jordan's unintelligible shout is just another unintelligible shout, not an incriminating one. Absent his companion's flight, Jordan's location does not suggest that he was engaged in criminal activity. With or without his companion's flight, the anonymous tip did not provide any information that provided a high degree of reliability that its assertion of illegality was accurate. Despite the majority opinion's protestation to the contrary, this case is about imputing one person's evasive conduct to another person because of proximity. I would hold, pursuant to Section 14, Article I of the Ohio Constitution, that when police officers respond to an anonymous tip that does not establish that the tipster has "knowledge of concealed criminal activity," a companion's flight from the scene does not provide reasonable, particularized suspicion of criminal activity sufficient to justify a *Terry* stop of the person who did not flee. *J.L.*, 529 U.S. at 272, 120 S.Ct. 1375, 146 L.Ed.2d 254. I dissent.

---

William D. Mason, Cuyahoga County Prosecuting Attorney, and Lisa Reitz Williamson, Assistant Prosecuting Attorney, for the state of Ohio.

Robert L. Tobik, Cuyahoga County Public Defender, and John T. Martin, Assistant Public Defender, for appellant Jordan in case No. 2002–1888 and for appellee and cross-appellant Finger in case No. 2003–0567.

Eric Allen and Paul Skendelas, urging reversal in case No. 2002–1888 for amicus curiae, Ohio Association of Criminal Defense Lawyers.