[Cite as *State v. Burgett*, 2010-Ohio-5945.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                CASE NO. 9-10-37

    v.

HARVEY D. BURGETT,                O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 09-CR-034

Judgment Affirmed

Date of Decision:    December 6, 2010

APPEARANCES:

    *Kevin P. Collins* for Appellant

    *Gregory A. Perry* for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Harvey D. Burgett, appeals from the judgment of the Court of Common Pleas of Marion County convicting him of attempted burglary and sentencing him to a five-year prison term on the offense and a four-year and ten-month prison term for violating post release control, to be served consecutively to each other, for a total prison term of nine years and ten months. On appeal, Burgett argues that his conviction was against the manifest weight of the evidence and that his sentence was contrary to law, where the trial court failed to notify him upon sentencing in a prior offense of the consequences of committing a felony while on post release control. Based on the following, we affirm the judgment of the trial court.

{¶2} In February 2010, the Marion County Grand Jury indicted Burgett on one count of attempted burglary in violation of R.C. 2911.12(A)(2), a felony of the third degree. The indictment arose from an incident whereby Burgett attempted to break into a home while its residents were away. Subsequently, Burgett entered a not guilty plea to the charge in the indictment.

{¶3} In April 2010, the case proceeded to a jury trial, at which Coral Fitsko testified that she was employed as a dispatcher with the Marion City Police Department; that she received a call on January 16, 2010, at 1:32 p.m. regarding an alleged burglary in progress on Church Street in Marion County; that the caller

identified himself as Mr. VanBuskirk; that, according to the report she made on that day, Patrolman Josh Harris arrived near the scene at North Grand Avenue at 1:36 p.m., identified Burgett at 1:38 p.m., and arrested Burgett at 1:55 p.m.; that, VanBuskirk identified the perpetrator of the burglary as being approximately thirty-five years of age, having long, stringy brown hair, and wearing a Carhart coat; that VanBuskirk did not identify the perpetrator as having a large tattoo on his neck; that VanBuskirk did not indicate during his call that he saw the perpetrator take off his coat and "switch it around" (trial tr., vol. 1, p. 101); that, during the call, VanBuskirk stated that he lost sight of the perpetrator for a brief time, but then was able to see him again; and, that, although she testified regarding the times that Burgett was identified and arrested by Patrolman Harris, it was possible those times could be different because she entered information into the system when it was relayed to her by the officer.

{¶4} Kenneth VanBuskirk testified on direct examination that he lived next door to Dave and Cyndee Hurlebaus at 699 East Church Street; that, on January 16, 2010, he was traveling back to his house from the grocery store and he passed the Hurlebauses, who were traveling in the opposite direction; that he returned home and entered his house to put the groceries away, and he heard a "loud bang noise" (id. at 129); that he then stepped out onto his back porch and observed Burgett at the back door to the Hurlebauses' residence, leaning against

the railing and kicking in the middle part of the door; that he told Burgett to stop kicking the door, and Burgett replied that his wife was inside the house; that he then stated to Burgett that his wife was not in there and that Burgett needed to stop kicking the door; that Burgett replied he was not kicking the door, but was knocking on it; that he standing was approximately twenty-five feet from the Hurlebauses' back porch when this incident occurred; and, that Burgett appeared to be approximately thirty-five years old at the time and had on a jacket with the hood down.

{¶5}  VanBuskirk continued that he realized that Burgett was attempting to break into the residence so he called 9-1-1; that, as he called 9-1-1, he saw Burgett walk down the back steps and towards the front of the residence; that he walked through his house to follow Burgett; that, when he stepped onto his front porch, he could not see Burgett, but saw another man across the street wearing a different colored coat; that he only lost site of Burgett for five or six seconds; that he then proceeded to run to the intersection of Church Street and Grand Avenue, and he observed Burgett heading north on Grand Avenue; that he was approximately fifty feet from Burgett when he observed him walking down Grand Avenue; that Burgett then looked over his shoulder, "flipped up his hood" and started a slow jog (id. at 140); that he continued to follow Burgett, and Burgett continued to look over his shoulder, and then began to run; that police cruisers

then proceeded down Grand Avenue in the direction that Burgett was running, and they made a stop near the end of the street; that, during this time, he was on the phone with the 9-1-1 operator and was asked if he would walk to where the police made the stop and identify Burgett; that, when he arrived at the location, the police opened the back of the cruiser for Burgett to step out, and Burgett stated, "I don't know what you're thinking but I'm not the one" (id. at 143); that he was able to identify Burgett as the individual kicking at the back door of the Hurlebauses' residence based upon his clothing and face; that there was no doubt in his mind that his identification of Burgett was accurate; that, when he identified Burgett, he noticed Burgett's coat was turned inside-out; that, when he first saw Burgett on Grand Avenue, his coat was not inside-out and he never lost site of him as he followed him on Grand Avenue; that, at one point while he was following Burgett, there was a three-hundred-yard distance between them, but he never saw Burgett rearrange his clothing; that the only other person he saw during this incident was the man that he saw across the street when he left his house to follow Burgett; that the man headed in the same direction as he and Burgett; and, that he later saw the police talking to the man after they arrested Burgett.

{¶6} VanBuskirk testified on cross-examination that, when he spoke with Burgett while he was attempting to kick the door, he was able to look at Burgett's face; that Burgett did not have anything covering his face; and, that, when Burgett

initially walked down from the porch at the Hurlebauses' residence, he did not run or try to hide.

{¶7} Patrolman Shane Gabriel of the Marion City Police Department testified that she responded to a burglary in progress dispatch call on January 16, 2010; that she and another officer went to the location of the attempted burglary; that, when they checked the perimeter of the residence, they saw footprints and that the rear storm door was open; that there was also a partial shoeprint on the rear door, but she did not observe any damage to the door; that the following day, she returned to the residence to see the inside of the back door; that there were paint chips and cracks in the rear door; that the homeowners, the Hurlebauses, indicated that the paint was not chipped prior to the attempted burglary; and, that no attempt was made to compare Burgett's shoe to the shoe print found at the residence.

{¶8} Roger Morgan testified that he was Burgett's uncle; that he had been convicted of felonies over ten years go, and that he was currently on community control for "failure to register" (id. at 179); that Burgett and his wife stayed overnight with him on January 15, 2010; that Burgett and his wife had an argument on that evening, and the argument continued into the next morning; that, on January 16, 2010, Burgett asked him to go for a walk; that they walked to Dino's Drive Thru, and he went inside and purchased a pack of cigarettes; that,

when he exited the drive thru, he saw Burgett across the street walking down Church Street; that he then saw Burgett knock on someone's front door, walk down from the porch, and proceed down the driveway to the back of the residence; that, after some time, Burgett came back from the rear of the house, and a man with a brown coat who was on his cell phone came out of another house; that Burgett then proceeded to walk down North Grand Avenue, and the man followed him; that he then walked "to the next street, walked on down and come up the ally and the police officers had [Burgett] in the cruiser talking to him" (id. at 185-186); that Burgett was wearing a white, long coat at the time; that from the time Burgett came from the house to the time he was apprehended by the police was approximately five or ten minutes; and, that he and Burgett did not "get along that well." (Id. at 191).

{¶9} Officer Rob Reed of the Marion City Police Department testified that, on January 16, 2010, he received a dispatch call regarding a burglary in progress on Church Street; that he went to a residence on Church Street and two other officers were already present, so he then proceeded to Grand Avenue where Burgett had been stopped; that, upon approaching Burgett, he noticed Burgett's coat was inside-out; that he never observed Burgett with the plain, brown side of his coat facing out; that he spoke with Burgett, and Burgett indicated that he had come from his sister's house on Wilson Avenue and was proceeding to his

girlfriend's house to fix a bicycle; that, when he asked Burgett where his girlfriend's house was located, Burgett pointed and stated he did not know the street name or the address of the house; that, when he asked Burgett where his sister lived, Burgett did not give a response; that Burgett did not appear to be out of breath and was calm during their conversation; that, subsequently, VanBuskirk identified Burgett as the individual attempting to break into the residence; and, that VanBuskirk did not appear at all uncertain of his identification.

{¶10} Patrolman Josh Harris of the Marion City Police Department testified that he received a dispatch call regarding a breaking and entering on January 16, 2010; that he drove to Center Street, as dispatch indicated the suspect was headed in that direction; that he turned from Center Street on to North Grand Avenue; that he identified a man walking down the middle of the street that matched the description of the suspect; that he stopped the individual, who then identified himself as Harvey Burgett; that Burgett indicated he was on his way to his uncle's house on Jefferson to work on a bike; that Burgett was never out of breath and did not attempt to run when he stopped him; that, when he advised Burgett that a witness was coming to identify him, Burgett immediately began removing his jacket and stated that they "weren't going to pin something on him" (trial tr., vol. 2, p. 220); that VanBuskirk then arrived and identified Burgett as the man he had been following; that Burgett responded that VanBuskirk had him

confused with someone else; and, that he found a pair of vice grips in Burgett's pocket, which Burgett indicated he was going to use to work on a bike at his uncle's house.

{¶11} David Hurlebaus testified that he had lived at 707 Church Street for thirteen years; that, on January 16, 2010, he and his wife left their house around 1:00 p.m. to attend a funeral; that they returned home in the early evening or late afternoon; that, when they returned home, they noticed that their back screen door was open and the screen inside the door had been removed; that this was unusual because they do not use that door and leave it locked, and it was closed when they left the house; that VanBuskirk lived next door; that, inside the house, he observed that the back door was cracked on both the inside and the outside; that the door was not previously cracked; and, that he had never met Burgett or given him permission to enter his home.

{¶12} Thereafter, the State rested and Burgett moved for an acquittal pursuant to Crim.R. 29 on the grounds that insufficient evidence was presented to support an attempted burglary conviction, and that the evidence only supported a conviction for criminal damaging. The trial court then denied the motion.

{¶13} Subsequently, Burgett was convicted of attempted burglary and was sentenced to a five-year prison term on the attempted burglary conviction and a four year and ten-month prison term for committing a felony while on post release

control from a previous aggravated burglary conviction, to be served consecutively, for a total prison term of nine years and ten months.

{¶14} It is from his conviction and sentence that Burgett appeals, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**DEFENDANT-APPELLANT'S CONVICTION FOR ATTEMPTED BURGLARY IS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. II*

**DEFENDANT-APPELLANT'S SENTENCE IS CONTRARY TO LAW.**

*Assignment of Error No. I*

{¶15} In his first assignment of error, Burgett argues that his conviction was against the manifest weight of the evidence. Specifically, he contends that the testimony of the witnesses did not demonstrate that he exhibited conduct consistent with a purpose to commit a criminal offense in the residence; that the testimony of his identification failed to establish him as the perpetrator of the attempted burglary; and, that his conduct when contacted by police did not evidence his guilt. We disagree.

{¶16} When an appellate court analyzes a conviction under the manifest weight standard, it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and

determine whether, in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, superseded by constitutional amendment on other grounds as stated by *State v. Smith,* 80 Ohio St.3d 89, 1997-Ohio-335, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175. Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. Id.

{¶17} Burgett was indicted on one count of attempted burglary under R.C. 2911.12(A)(2), which provides as follows:

> **(A) No person, by force, stealth, or deception, shall do any of the following:**
>
> **\* \* \***
>
> **(2) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense.**

Moreover, R.C. 2923.02 sets forth the elements of an attempt to commit an offense as follows:

> **(A) No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense.**

R.C. 2923.02(A).

{¶18} In the case at bar, VanBuskirk, the Hurlebauses' neighbor, testified that he saw Burgett kicking at the Hurlebauses' back door; that Burgett told him he was not kicking the door, but was knocking; that he was approximately twenty-five feet away from Burgett and was able to see Burgett's face; that Burgett was wearing a jacket at the time; that he followed Burgett from the Hurlebauses' residence down Grand Avenue; that, as he followed Burgett, Burgett continued to look over his shoulder and then began to run; that he only lost sight of Burgett for five or six seconds while he was following him; that he identified Burgett as the person who attempted to kick in the door at the Hurlebauses' residence after Burgett was apprehended by police; and, that there was no doubt in his mind his identification of Burgett was accurate.

{¶19} Morgan, Burgett's uncle, testified that he saw Burgett approach a residence on Church Street and go down the driveway to the back of the house; that, when Burgett came back to the front of the residence, a man on a cell phone was following Burgett; and, that Burgett began to walk down Grand Avenue but was apprehended by the police.

{¶20} Officer Reed testified that Burgett told him he was going from his sister's house to his girlfriend's house to repair a bicycle, but Burgett was unable to give the street name or address of his girlfriend's residence, and that

VanBuskirk identified Burgett as the individual kicking at the Hurlebauses' back door.

{¶21} Patrolman Harris testified that he stopped Burgett as he was walking down Grand Avenue; that Burgett stated he was on his way to his uncle's house to work on a bike; that, when he informed Burgett that a witness was on his way to identify him, Burgett immediately began to remove his jacket; and, that VanBuskirk identified Burgett as the individual kicking at the Hurlebauses' back door.

{¶22} Additionally, Mr. Hurlebaus testified that, when he and his wife returned home from a funeral, the back screen door was open and the screen had been removed; that the door had cracks on the inside and outside; and, that the door was not previously cracked.

{¶23} Based on the testimony presented, we find that the manifest weight of the evidence clearly demonstrates Burgett's commission of the attempted burglary. Not only was VanBuskirk standing twenty-five feet from Burgett when he saw him on the Hurlebauses' porch kicking at the back door, but VanBuskirk followed him down the street until he was apprehended by police, only losing sight of him for five or six seconds. Additionally, VanBuskirk was able to identify Burgett as the perpetrator once the police stopped him. Moreover, Burgett's

uncle, Morgan, corroborated VanBuskirk's testimony, stating that he saw a man on a cell phone following Burgett as Burgett came from the residence.

{¶24} Further evidence of Burgett's guilt is seen in his conflicting stories to the police about where he was coming from and where he was going, including being unable to identify the street or address of his girlfriend's residence, and attempting to remove his coat as soon as he was notified that a witness was coming to identify him.

{¶25} Finally, we find no merit to Burgett's argument that the evidence did not demonstrate his intent to commit a criminal offense in the residence, a necessary element of burglary under R.C. 2911.12(A)(2). "Unless circumstances giving rise to a different inference are present, a reasonable inference arises that the individual entered the structure with the intent to commit a theft offense." *State v. Ridgway*, 4th Dist. No. 02CA20, 2003-Ohio-1152, ¶17; *State v. Levingston*, 106 Ohio App.3d 433, 436. Burgett offered no explanation of why he attempted to enter the Hurlebauses' residence, so the evidence establishing his attempt to enter the residence was also sufficient to prove he intended to commit a theft offense therein.

{¶26} Accordingly, we overrule Burgett's first assignment of error.

*Assignment of Error No. II*

{¶27} In his second assignment of error, Burgett argues that his sentence is contrary to law and, therefore, void. Specifically, he contends that the trial court failed to notify him upon his conviction and sentence for aggravated burglary in April 2005 that, should he commit a felony while on post release control, he could be sentenced to an additional term of imprisonment, to be served consecutively to any prison sentence imposed for the commission of a new offense.

{¶28} While we recognize a trial court's duty to notify an offender, both on the record and in its journal entry, that he will be subject to a period of post release control upon the conclusion of his prison term pursuant to R.C. 2929.19(B)(3)(c) and *State v. Jordan*, 104 Ohio St. 3d 21, 2004-Ohio-6085, paragraph one of the syllabus, and that, should he violate the terms of post release control, an additional prison term may be imposed, see R.C. 2929.19(B)(3)(e), we find no such requirement contained in the statute mandating the trial court to notify a defendant of all the possible consequences of his commission of a felony while on post release control, as set forth under R.C. 2929.141. As we noted in *State v. Lane*, 3d Dist. No. 1-10-10, 2010-Ohio-4819, ¶15, the possible consequences of the commission of a felony under R.C. 2929.141 are discretionary options of the trial court, and no notice to a defendant of those options is required.

**{¶29}** Additionally, other appellate districts that have addressed this issue have reached the same conclusion. See *State v. Susany*, 7th Dist. No. 07 MA 7, 2008-Ohio-1543, ¶95 ("Appellant fails to direct our attention to any holding which states that a defendant must be advised that upon the commission of a new offense, a defendant is subject to additional prison time for any felony committed while on postrelease control. There is no such requirement * * *"); *State v. Mullins*, 12th Dist. No. CA2007-01-028, 2008-Ohio-1995, ¶13 ("We find *Susany* to be persuasive and similarly find no error in the trial court's failure, at appellant's sentencing on his original offense, to inform him of the potential sentence for committing a new felony while on postrelease control").

**{¶30}** Finally, we note that Burgett failed to supplement the record with his April 2005 judgment entry of conviction or the transcript from that sentencing hearing. Although he attached the April 2005 judgment entry as an appendix to his brief, such appendix is not considered to be an official part of the record. *Grove v. Grove*, 3d Dist. No. 13-2000-32, 2001-Ohio-2109; App.R. 9(A). Consequently, without a record of the proceedings, we must presume the regularity of the proceedings and overrule his assignment of error. *In re Predmore*, 187 Ohio App.3d 100, 2010-Ohio-1626, ¶35, citing *State v. West*, 3d Dist. No. 2-06-04, 2006-Ohio-5834, ¶¶51, 53.

**{¶31}** Accordingly, we overrule Burgett's second assignment of error.

**{¶32}** Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and PRESTON, J., concur.**

**/jlr**