DECISION AND JOURNAL ENTRY
{¶ 1} Defendant-Appellant Henry L. Stepler has appealed from his convictions of gross sexual imposition, intimidation, and importuning and his subsequent sentence imposed by the Summit County Court of Common Pleas. This Court affirms in part and reverses in part.
 I {¶ 2} On February 17, 2004, Defendant-Appellant Henry L. Stepler was indicted on two counts of gross sexual imposition, in violation of R.C.2907.05(A)(4), felonies of the third degree; two counts of importuning, in violation of R.C. 2907.07(A), felonies of the fourth degree; two counts of intimidation of a crime victim or witness, in violation of R.C. 2921.04(B); and one count of possessing criminal tools, in violation of R.C. 2923.24, a felony of the fifth degree. Appellant pled "not guilty" to all counts of the indictment.
 {¶ 3} On September 8, 2004, a jury trial commenced and Appellant was found guilty of two counts of gross sexual imposition, two counts of importuning, and two counts of intimidation of crime victim or witness; the jury also found that the two victims were under the age of thirteen at the time of the crime. The jury found Appellant not guilty of possessing criminal tools.
 {¶ 4} The trial court sentenced Appellant to a combination of concurrent and consecutive terms for a total term of 10 years definite incarceration. The trial court also labeled Appellant a sexual predator.
 {¶ 5} Appellant has timely appealed his conviction and sentence, asserting two assignments of error.
 II Assignment of Error Number One
"Appellant's convictions were against the manifest weight of the evidence."
 {¶ 6} In his first assignment of error, Appellant has argued that his convictions were against the manifest weight of the evidence. Specifically, Appellant has argued that his convictions were based entirely on the testimony of two non-credible witnesses. We disagree.
 {¶ 7} In reviewing whether a conviction is against the manifest weight of the evidence, this Court must:
"[R]eview the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten
(1986), 33 Ohio App.3d 339, 340.
 {¶ 8} Weight of the evidence concerns the tendency of a greater amount of credible evidence to support one side of the issue more than the other. State v. Thompkins (1997), 78 Ohio St.3d 380, 387. Further, when reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror," and disagrees with the factfinder's resolution of the conflicting testimony. Id. An appellate court must make every reasonable presumption in favor of the judgment and findings of fact of the trial court. Karchesv. Cincinnati (1988), 38 Ohio St.3d 12, 19. Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983), 20 Ohio App.3d 172, 175; see, also, Otten, 33 Ohio App.3d at 340.
 {¶ 9} Appellant has argued that his convictions for gross sexual imposition, importuning, and intimidation of crime victim or witness were against the manifest weight of the evidence. The State has responded that it established the required elements of the offenses and the jury did not lose its way.
 {¶ 10} Appellant was convicted of three separate felonies: 1) gross sexual imposition; 2) importuning; and 3) intimidation of crime victim or witness. Pursuant to R.C. 2907.05, "[n]o person shall have sexual contact with another * * * when * * * [t]he other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person." R.C. 2907.05(A)(4). Importuning prohibits a person from soliciting "a person who is less than thirteen years of age to engage in sexual activity with the offender, whether or not the offender knows the age of such person." R.C. 2907.07(A). Pursuant to R.C. 2921.04:
"(B) No person, knowingly and by force or by unlawful threat of harm to any person or property, shall attempt to influence, intimidate, or hinder the victim of a crime in the filing or prosecution of criminal charges or an attorney or witness involved in a criminal action or proceeding in the discharge of the duties of the attorney or witness." R.C. 2921.04.
 {¶ 11} During the trial, Officer Charles Artis, of the Akron Police Department ("APD") testified to the following for the State. He was working the early morning hours of February 4, 2004 when he received a "fight call" at 582 Robinette Court in Akron. When Officer Artis and his partner arrived at the home, he observed two "distraught" young girls running towards the patrol car; one girl was wearing a nightgown and the other had on pajamas. Officer Artis and his partner ushered the girls back inside the house and learned that the perpetrator was gone. After hearing allegations from the girls about the perpetrator touching them, Officer Artis called the detective bureau. The girls were taken to Akron Children's Hospital ("Children's") and Officer Artis collected the one victim's pajama bottoms because the pants had a cut in them and she stated the perpetrator had cut them. The cut was on the front right leg.
 {¶ 12} On cross-examination, Officer Artis testified that the cut on the pajamas looked like a cut, rather than a snag or tear, but he was not able to tell if the cut was caused by a knife or scissors.
 {¶ 13} A.R., a twelve year-old female, testified to the following for the State. She had been friends with C.K., a ten year-old female, for over four years. A.R. had known the Appellant for a couple of years through her parents, C.K. and C.K's mother. The evening of February 3, 2004 A.R. went to C.K.'s house to spend the night; the girls decided to sleep in the bedroom in the basement. C.K.'s mother and Appellant were upstairs when the girls went to bed. A.R. wore a nightgown and her underwear and C.K. had on pajamas with a top and bottom. Appellant came downstairs and the girls pretended to be asleep and Appellant "touched" C.K. and shook A.R. under her armpit and touched her breast. Appellant told the girls that he "wanted [them] to help him with his sexual life" and that he had $20 bills. After asking for help with his sexual life, he told C.K. he would kill her if she told anyone what had happened.
 {¶ 14} A.R. continued testifying to the following. She witnessed Appellant touch C.K's "private part" and touch her under her pajama bottoms with his fingers. Appellant then touched A.R. under her underwear, touching her vagina. Both girls were scared and were screaming for C.K's mother. Appellant then pulled out a knife with white on it with a symbol on the end and cut C.K.'s pajama bottoms. Appellant threatened them, stating that he would kill them if they ever told anyone what had happened. After Appellant went upstairs, the girls followed and told C.K's mother what had happened. Appellant said he didn't do anything and said he would take a polygraph test. C.K's mother told C.K. to call the police and Appellant pushed C.K's mother down. Appellant then took off in his car, but returned about ten minutes later and told them that he hoped they hadn't called the police and that if they did they would be in trouble. Appellant then left for a second time.
 {¶ 15} While testifying, A.R. identified the knife Appellant used to cut C.K.'s pajama bottoms as the knife the police had taken from Appellant when he was arrested.
 {¶ 16} A.R. testified to the following on cross-examination. Appellant entered the basement at least three times while the girls were supposed to be sleeping. The first time Appellant came down he stood on the steps to check to see if they were asleep. The second time he came down he yelled at them to stop making so much noise. The third time he came downstairs is when he touched them and he was downstairs "for at least 20 minutes." C.K. wasn't screaming "like someone normally would [.]" C.K.'s scream was more like a cry. Appellant had drunk "a lot of beers" that night. Appellant offered the girls money for a "BJ." Appellant touched C.K. first. Even though A.R. was pretending to be asleep with her eyes closed, she was able to see what Appellant was doing to C.K.C.K. kept telling Appellant to stop and he did not listen. Appellant reached in C.K.'s pajama bottoms from the top.
 {¶ 17} On re-direct examination, A.R. testified that when she was pretending to be asleep she was peeking to see what was going on.
 {¶ 18} C.K. testified next and her testimony mirrored A.R.'s about when they arrived at C.K's house, where they slept, what they were wearing to bed, how many times Appellant came downstairs, and that Appellant asked them to perform sexual acts on him. Specifically, C.K. testified to the following. The second time Appellant came downstairs he asked them to perform sexual acts. The third time he came downstairs he again offered the girls money for sexual acts and touched them. Appellant touched her first; he touched her vagina under her panties with his hand. C.K. asked him what he was doing and he cut her pants and told her not to tell anyone or he would kill her. She witnessed Appellant touch A.R.'s vagina. After Appellant touched the girls, C.K.'s mother yelled for him and he went back upstairs. C.K's mother heard the girls talking downstairs and told them to come upstairs. The girls then whispered in her ear what had happened. Appellant then denied doing anything and Appellant and C.K.'s mother began fighting. C.K.'s mother gave her the phone and she called 911. Appellant then left the house but came back "a couple minutes later" to say he was sorry, but they would not let him in the house.
 {¶ 19} During her testimony, C.K. identified the knife Appellant used to cut her pajamas as the knife the APD recovered from Appellant.
 {¶ 20} C.K. testified to the following on cross-examination. She could not remember if Appellant said anything to her and A.R. the second time he came downstairs. Appellant put his hand down her pajama bottoms when he touched her. She did not cry out or call her mother for help. C.K. denied ever claiming that someone had done something to her when in fact nothing had happened. She also denied talking to A.R. about the incident since that night.
 {¶ 21} Detective Brian Reilly of the APD testified to the following for the State. He interviewed the girls in the basement on the bed where the incidents allegedly occurred. He interviewed A.R. first and A.R. told him that Appellant touched her and C.K's vaginas and requested sexual acts for payment. A.R. also told him that Appellant brandished a knife, cut C.K.'s pajamas, and threatened that he would kill them if they told anyone what he did. Det. Reilly then interviewed C.K. and her statements were consistent with A.R.'s statements. He found that "[a]ll major points of the [girls'] story were consistent." Det. Reilly's impression was that the incident did occur and the girls were telling the truth.
 {¶ 22} APD Detective Rex Lott testified to the following. He arrested Appellant on February 4, 2004. During the search incident to Appellant's arrest, a knife was found in Appellant's possession and taken into evidence. The knife found during the arrest was the knife identified by the victims during their testimony.
 {¶ 23} APD Detective Clarence Dorsey testified to the following. He took the crime scene photographs of the bed and surrounding area. On cross-examination, Det. Dorsey testified that the bed was made when he took the photographs and it did not "seem" like anyone had been actually in the bed, rather they could have been sitting or sleeping on top of the covers. Det. Dorsey did not know if anyone touched the bed after the police were called.
 {¶ 24} Elizabeth Morstatter ("Morstatter"), a Children's social worker, testified to the following. She interviewed and evaluated A.R. and C.K. It was determined that A.R. and C.K. would return to the CARE center at 8:00 a.m. rather than wait until all of the CARE staff had arrived. C.K. "was very scared about going home. She was afraid that the man would come back." When Morstatter spoke with A.R., A.R. told her that Appellant shook her by her breast, tried to grab her and slit C.K.'s pants because C.K. was going to tell. A.R. also told Morstatter that Appellant offered them money, threw C.K. on the bed, and that the knife was black. A.R. told Morstatter that the first time Appellant entered the basement he shook her; the second time he touched C.K. on her private parts; and the third time he touched A.R.'s private parts. When Morstatter interviewed Brenda, C.K.'s mother, she told her that C.K. and A.R. came upstairs after Appellant had been in the basement and C.K. told her that Appellant had shaken A.R. on her chest and had touched C.K. on her private parts. Brenda also told Morstatter that she examined C.K. and A.R. and noticed red marks. C.K. told Morstatter that Appellant entered the basement three or four times and wanted C.K. to "help with his sexual stuff." C.K. told her that the fourth time Appellant went downstairs he "went up [their] shirts and down [their] pants." C.K. also told Morstatter that Appellant grabbed her private and left marks. C.K. stated that Appellant touched her first and then A.R.C.K. told Morstatter that she whispered to her mother what Appellant had done. C.K. and Brenda informed Morstatter of C.K.'s mental health issues and C.K. was admitted to the psychiatric ward of Children's after Morstatter's interview.
 {¶ 25} At the close of the State's case, Appellant made a Crim. R. 29 motion, which was denied by the trial court. Appellant then rested his case without presenting any witnesses.
 {¶ 26} After careful review of the entire record, weighing the evidence and all reasonable inferences and considering the credibility of the witnesses, this Court cannot conclude that the jury clearly lost its way when it found Appellant guilty of two counts of gross sexual imposition, two counts of importuning, and two counts of intimidation of crime victim or witness. The jury was in the best position to evaluate the credibility of witnesses and give proper weight to their testimony. See State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Although slight differences could be found between the victims' testimony and their initial reports to authorities, Appellant's convictions were not against the manifest weight of the evidence simply because the jury chose to believe the evidence of Appellant's guilt offered by the prosecution. State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at 4. Furthermore, the jury as the fact finder was entitled to reconcile any differences and inconsistencies in the victims' testimony and determine that the manifest weight of the evidence supported the conviction of Appellant. See DeHass, supra. Making every reasonable presumption in favor of the judgment, we cannot find that the record weighs heavily against the convictions.
 {¶ 27} Based on the foregoing, Appellant's first assignment of error lacks merit.
 Assignment of Error Number Two
"The trial court erred in not notifying appellant of post-release control and the consequences of violation of post-release control restrictions."
 {¶ 28} In his second assignment of error, Appellant has argued that the trial court erred when it sentenced him. Specifically, Appellant has argued that the trial court erred when it failed to notify him at sentencing of post-release control and the consequences for violating postrelease control. We agree.
 {¶ 29} In State v. Jordan, the Ohio Supreme Court clarified when a defendant must be notified of postrelease control. State v. Jordan,104 Ohio St.3d 21, 2004-Ohio-6085. The Jordan Court found that "when sentencing a felony offender to a term of imprisonment, a trial court is required to notify the offender at the sentencing hearing about postrelease control and is further required to incorporate that notice into its journal entry imposing sentence." (Footnote omitted). Id. at ¶ 17. If a trial court sentences a defendant and fails to properly notify him about postrelease control, the sentence is contrary to law and the matter must be remanded for resentencing. Id. at ¶ 23.
 {¶ 30} It is undisputed in the case sub judice that the trial court failed to comply with Jordan and properly notify Appellant about postrelease control. The record reveals that the trial court failed to include the notice at the sentencing hearing and in the subsequent sentencing journal entry. Accordingly, Appellant's sentence is contrary to law and he must be resentenced.
 {¶ 31} Appellant's second assignment of error has merit.
 III {¶ 32} Appellant's first assignment of error is overruled. Appellant's second assignment of error is sustained. The judgment of the Summit County Court of Common Pleas is affirmed in part and reversed in part and the cause is remanded for proceedings consistent with this opinion.
Judgment affirmed in part, reversed in part, and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to both parties equally.
Exceptions.
Slaby, P.J. Batchelder, J. concur.